FILED
05/24/2019
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 17, 2019 Session

## ERIC LOVETT ET AL. V. MARSHALL STEVEN COLE, JR. ET AL.

**Appeal from the Chancery Court for Roane County**
No. 2016-81      Frank V. Williams, III, Chancellor

---

### No. E2018-00719-COA-R3-CV

---

AND

## RALPH SALAS ET AL. V. MARSHALL STEVEN COLE, JR.[1]

**Appeal from the Chancery Court for Roane County**
No. 2016-133      Frank V. Williams, III, Chancellor

---

### No. E2018-01082-COA-R3-CV

---

Eight owners of real property in the Daniels[2] Estates Subdivision in Roane County, filed suit seeking equitable relief and money damages from defendants, Marshall Steven Cole, Jr. and his wife, Sarah Cole, after defendants allegedly blocked and/or otherwise made impassable a disputed drive known as "Kudzu Drive." In a later-filed separate action, two additional owners of property in the subdivision filed suit seeking equitable relief and money damages from Mr. Cole individually. Collectively, plaintiffs claim Kudzu Drive is part of a "joint private permanent easement" dedicated to the use of all of the tract owners in the subdivision. Defendants, on the other hand, claim that the easement consists of a road known as "Daniel Road," of which Kudzu Drive is *not* a part. Kudzu Drive, defendants allege, is an independent drive situated exclusively on their property. After a bench trial, the court held that Daniel Road and Kudzu Drive encompass one subdivision road dedicated to the use of all subdivision residents. It held that all right, title, and interest in the disputed drive is vested in the homeowner's association by virtue of an

---

[1] These two matters were consolidated at trial and for the purpose of oral argument before us.

[2] The last name of the subdivision's creator is "Daniel." However, the subdivision's designation took on the plural "Daniels."

after-the-fact quitclaim deed executed to it by the subdivision's previous owner and developer, Mrs. Melvia Mae "Peggy" Daniel. The court enjoined defendants from preventing the homeowner's association from improving or opening "Kudzu Drive." The court ordered defendants to remove two gates, a berm, and any other obstructions preventing ingress and egress along Kudzu Drive. The court awarded "damages to all of the [p]laintiffs for [s]lander of [t]itle." The court awarded $14,133.79 in attorney's fees and expenses to each set of plaintiffs in the consolidated matters. The court awarded an additional $750 to plaintiffs in *Eric Lovett et al. v. Marshall Steven Cole, Jr. et al.* for attorney's fees and expenses incurred in preparing the final order for the trial court's signature. Defendants appeal. We reverse the trial court's judgment in which the court decreed that the property referred to as Kudzu Drive is a part of the joint private permanent easement dedicated to the use of all of the tract owners. We hold, instead, that Kudzu Drive is an independent drive situated exclusively on the defendants' property. In view of our decision, we also reverse all monetary awards of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY, and THOMAS R. FRIERSON, II, JJ., joined.

Arthur G. Seymour, Jr. and Robert L. Kahn, Knoxville, Tennessee, for the appellees, Eric S. Lovett, Michelle A. Lovett, Cathy Rakestraw, Clair James Rakestraw, Jr., James P. Goodman, Ruth A. Goodman, Matthew F. Berry, and Deanna Berry.

Kevin A. Dean, Knoxville, Tennessee, for the appellees, Ralph Salas and Gisela Salas.

Marshall Steven Cole, Jr. and Sarah Cole, Kingston, Tennessee, appellants, Pro Se.

**OPINION**

**I.**

**A.**

Prior to the creation of Daniels Estates, the entirety of the real property now comprising the subdivision was owned by Peggy Daniel and her husband, Calvin Daniel. Following her husband's death, Mrs. Daniel decided to develop and divide her real property for purpose of sale. To that end, in 2002, Mrs. Daniel commissioned the assistance of a land surveyor and engineer, William Leggins.

Mr. Leggins surveyed Mrs. Daniel's real property. On a plat dated April 4, 2002 – and the 2002 timeframe is very significant (more about this later) – he laid out ten

sellable tracts consisting of at least ten acres each. Initially, only eight of the subdivision's tracts were intended for sale,[3] because, at the time Mr. Leggins created the plat, Mrs. Daniel retained and continued to reside on the real property that would later be divided and sold as tracts 9 and 10. None of the initial eight tracts are "land-locked," because, on the subdivision plat, Mr. Leggins also laid out a 50-foot wide looped road intending to serve as an access road to the subdivision's tracts.

On April 10, 2002, Mrs. Daniel executed a set of restrictions for the newly developed subdivision. As is relevant to the present matter, she included in paragraph 15 of the "Restrictions for Daniels Estates Subdivision," (henceforth "Restrictions"), the following description of an easement serving the tracts:

> JOINT PRIVATE PERMANENT EASEMENT; MAINTENANCE THEREOF; SPECIAL ASSESMENTS [sic]; LIEN RIGHTS. All lots in the subdivision shall be served by a private joint permanent easement as the same is shown on the recorded plat of said subdivision. No owner shall allow any vehicle or other property to block said easement. All individual lot driveways shall be constructed so as not to cause drainage problems or other interference with said joint easement…

(Capitalization and underlining in original). The "recorded plat of [the] subdivision," referenced in the Restrictions, refers to the plat created by Mr. Leggins and recorded by Mrs. Daniel in the Office of the Register of Deeds. The plat does not specifically indicate the location or parameters of the joint private permanent easement.

The recorded plat contains a "Certificate of Ownership and General Dedication" executed by Mrs. Daniel, which states:

> I MELVIA M. DANIEL, the undersigned owner of the property shown hereon, hereby adopt as my plan of subdivision as shown on this Plat. I hereby certify that I am the owner in fee simple of the property shown hereon. I further certify that all restrictive covenants which apply to the TRACTS on this Plat are either shown on the plan or are referred to thereon, with a copy of the referred to covenants filed with the Roane County Register of Deeds.

(Capitalization and underlining in original; underlined portion is penned in all capital letters). The above is signed by Mrs. Daniel, and dated May 8, 2002.

---

[3] The tract number for each of the initial eight is circled on Figure 1.

On November 23, 2005, some three years after the documents were recorded, Mrs. Daniel granted, by the previously noted quitclaim deed, the joint private permanent easement to the subdivision's homeowner's association. The deed (henceforth "Homeowners Easement Deed") describes the granted easement, as follows:

> ...without the corporate limits of any municipality, being known and designated as the joint private permanent easement within Daniels Estates Subdivision, more commonly known as Daniel Road, as shown by map of same of record in Plat Cabinet B, Page 142 in the Register's Office for Roane County, Tennessee, to which map specific reference is hereby made for a more particular description.

The "map of same of record in Plat Cabinet B, Page 142," referenced in the above Homeowners Easement Deed, refers to the plat created by Mr. Leggins, which is also the same plat referenced in the Restrictions. In addition to not specifying the precise location and parameters of the easement, the plat also does not denominate what is referenced in the Homeowners Easement Deed as "Daniel Road." Interestingly enough, the plat only identifies a Kudzu Drive in the "vicinity map." Therefore, central to the dispute in this matter is alleged ambiguity surrounding what constitutes the subdivision's joint private permanent easement referenced in the Restrictions and the subdivision's recorded plat.

Figure 1 shows the Daniels Estates Subdivision's recorded plat created by Mr. Leggins and recorded by Mrs. Daniel at the Register of Deeds Office. The plat is referenced in both the Restrictions and in the Homeowners Easement Deed. At trial, the plat was designated as exhibit A, as seen by the exhibit sticker placed in the right hand corner of Figure 1.

On Figure 1, we have added interlocking "X" marks to designate the disputed drive (henceforth "Disputed Drive"). Additionally, penned by this Court, are designations "A" and "B." These marks are consistent with those made on exhibit A by witnesses at trial; the marks designate the approximate locations of two gates allegedly placed across the disputed drive by defendants to block access. This Court has penned, in enlarged font, designations for each tract and U.S. Highway 70, which are original to the recorded plat, for the reader's convenience.

Furthermore, added to trial exhibit A by Roane County 911 Director Mike Hooks are two color-highlighted areas: pink and yellow. The color of the highlighted portions is frequently referenced by fact witnesses when testifying regarding the Disputed Drive. Highlighted in pink, is the segment of subdivision road, seen in Figure 1, that begins on the western edge along U.S. Highway 70; the road highlighted in pink proceeds north and then turns east, continuing between tracts 1 through 8 in a southerly loop; it then proceeds

-4-

northwest to complete the loop at the northern edge of tract 3 (henceforth the "Loop Access Road"). Defendants contend that the pink-highlighted segment is the entirety of the subdivision's access road, which is known as "Daniel Road." Highlighted in yellow, on trial exhibit A, is the road designated in Figure 1 by interlocking "X" marks (Disputed Drive); the vicinity map in Figure 2 denominates this segment of road as "Kudzu Drive." Kudzu Drive, defendants contend, is an independent drive situated exclusively on their property. Lastly, the horizontal marker seen on Figure 1, by the designation "A," is original to the plat and connotes that tract 9 includes the acreage on both sides of Kudzu Drive.



-5-

Figure 1.

Figure 2 below is a close-up image of the "vicinity map" and "general notes" sections featured in the bottom corner of Figure 1. Significantly, Figure 2 denominates Kudzu Drive along tract 9, in the subdivision, precisely where defendants contend it is located as an independent drive. On the other hand, it does not denominate Daniel Road, which is specifically referenced in the Homeowners Easement Deed's reference to the plat.



VICINITY MAP

GENERAL NOTES:

1. Iron rods set at all property corners, except as noted.

2. For Subdivision Restrictions and/or Covenants see DEED BOOK _F-22_; PAGE _757_

3. All road Right of ways are 50 feet wide. as noted.

4. Subject to any and all restrictions, covenants, conditions, planning commission ordinances, rights of way, and all easements if any, affecting said land.

Figure 2.

On July 18, 2016, as a result of the above-outlined dispute surrounding the location of the subdivision's joint permanent private easement, eight owners of tracts in the subdivision filed suit against defendants, Marshall Steven Cole, Jr. and his wife, Sarah Cole. That suit is styled, *Eric Lovett et al. v. Marshall Steven Cole, Jr. et al.*; the plaintiffs include: Cathy Rakestraw and Clair James Rakestraw, Jr., owners of tract 2; Eric S. Lovett and Michelle A. Lovett, owners of tract 3; James P. Goodman and Ruth A. Goodman, owners of tracts 4 and 5; and Matthew F. Berry and Deanna Berry, owners of tract 6.

On November 9, 2016, two additional owners of real property in the subdivision, Ralph Salas and Gisela Salas, filed a separate lawsuit against Mr. Cole individually. Plaintiffs Mr. and Mrs. Salas purchased "Lot 10 Daniel[s] Estates," by warranty deed, on January 4, 2007. The trial court held it was proper to:

consolidate [*Ralph Salas et al. v. Marshall Steven Cole, Jr.* and *Eric Lovett et al. v. Marshall Steven Cole, Jr. et al.*] for trial as to the use and dedication [] and ownership of the road that is in dispute, Kudzu Drive. And then we will, depending on the outcome of that, we will then go to a separate hearing on the damages issues that have been raised in the two lawsuits.

The trial court held that bifurcation was necessary, as to the issue of damages, because "there is a damage issue in the Salas['] case [] that is not common to the Lovett case." The Salas' case involves "what damages, if any, [are they] entitled to as a result of [the Salas'] attempts to sell [their] lot."

### B.

At trial, several individuals testified regarding what constitutes the subdivision's easement and regarding the existence and/or non-existence of a separate and independent segment of drive known as "Kudzu Drive."[4] In this testimony-driven and factually intensive matter, a thorough recounting of the testimony elicited at trial is necessary.

Eric Lovett, an owner of subdivision tract 3, testified that he and his wife, Michelle Lovett, purchased their property from Mrs. Daniel, in 2003. He argued that the easement:

> starts at the western entrance from Highway 70 and goes around... then continues on around, up the hill and back to the eastern entrance of Highway 70, serving all the tracts.

He testified that the 2005 Homeowners Easement Deed granted the easement, as he describes it, to the subdivision's homeowner's association and that the association is taxed for the easement. When Mr. Lovett was asked "[s]o the homeowners' association was deeded at that time Daniel Road, correct," he replied "I believe so."

Mr. Lovett testified that defendants "unilaterally placed gates and blocked the [disputed] road." He alleges Mr. Cole "constructed" one gate, and "took control" of a second gate that was installed by the homeowner's association. He indicated by designations "A" and "B," as seen on Figure 1, the location of the two gates defendants purportedly installed and/or otherwise locked. He complained that the tract owners do not have access to the gates and that Mr. Cole "intimidate[s] people from accessing that area or being anywhere near that area."

---

[4] Sometimes referred to by witnesses as Kudzu Lane or Kudzu Road.

Mr. Lovett also testified that Mr. Cole placed an "earthen berm approximately four feet tall that blocks any other access." He further alleged that Mr. Cole "graded the road inside the gate" making the Disputed Drive "somewhat impassable." He has demanded that Mr. Cole remove the gates and other alleged impediments, but Mr. Cole has refused to comply.

Mr. Lovett testified that there used to be a street sign at the intersection of the Disputed Drive and U.S. Highway 70 denominating it "Daniel Road." He alleges Mr. Cole unilaterally removed the sign. On cross, Mr. Lovett recounted that, when he bought his property, in 2003, there was a sign designating the Disputed Drive as "Kudzu Drive:"

> Q:   …is it your testimony that the [U.S. Highway 70] end of Kudzu Drive, that there was not a sign there that said "Kudzu Drive" when you bought your property?
>
> A:   That is not my testimony.
>
> Q:   Okay. There was a sign there that said "Kudzu Drive" then?
>
> A:   There was a sign there that said "Kudzu Drive," but there was no road there anyway.

In 2003, when he purchased his tract, he testified that Kudzu Drive was an unimproved driveway. The plaintiffs in *Eric Lovett et al. v. Marshall Steven Cole, Jr. et al.* rested after Mr. Lovett's testimony.

Ralph Salas, owner of subdivision tract 10, testified that his tract borders defendants' tract to the west. He and his wife purchased their property in 2007. His address is listed as "109 Daniel Road" on the Lot/Land Purchase and Sale Agreement, as "109 Daniel Road, Lot 10," on the property listing, and is listed as "Lot 10 Daniel Estates" on their deed. He alleged that a "Daniel Road" sign predated his purchase of tract 10. He testified that it is impossible to access his tract from the portion abutting U.S. Highway 70 because of the topographical slant of his tract.

Several years after Mr. Salas purchased tract 10, plaintiff Cathy Rakestraw, a friend of Mr. and Mrs. Salas and one of the owners of tract 2, informed Mr. Salas of a new neighbor "that had just moved in [] that might be interested in purchasing [his] lot." She gave him the new neighbor's number; the new neighbor was Mr. Cole. Mr. Salas corresponded with Mr. Cole "by text and eventually an email," attempting to sell tract 10 to the Coles. Mr. Cole did not purchase the property.

Brandon Hutchison, a realtor, testified regarding plaintiffs' claim for an injunction and the Salas' claim for damages against defendants for interference with their ability to sell their property. Mr. Hutchison testified that he had trouble locating the boundary lines for tract 10; he initially put the "for sale" sign on the Coles' property by mistake. Mr. Cole later encountered Mr. Hutchison and informed him of his mistake. It ultimately took him several attempts to successfully locate the property. On one occasion, when Mr. Hutchison went to show the property, he testified that Mr. Cole made him feel threatened. He specifically noted that Mr. Cole mentioned the fact that there were copperheads in the area and that the property does not "lie the right way." He felt Mr. Cole made these comments in a "demeaning" way. Mr. Hutchison ultimately canceled the listing, stating that he felt it would be difficult to sell the property under these conditions.

Christopher Perry was referred to the Salas' tract as an alleged potential buyer. He testified that his coworker, plaintiff Matthew Berry, helped him locate tract 10. When he viewed the property, he accessed it off of U.S. Highway 70. Mr. Perry testified that the Salas' entire property "goes down a hill;" it has a gradual slope of approximately ten feet and it gets "steeper and steeper" as you approach the center. He recalled an occasion where he went to view the property. He testified that, when he left, Mr. Cole followed him in his truck out of the subdivision and reported him to the police for trespassing. The police did not arrive until Mr. Perry was already home; he was not cited.

Mike Hooks, executive director for Roane County 911, testified regarding the location of Daniel Road. He stated that the strip of Disputed Drive, designated with interlocking "X" marks in Figure 1, is not a part of what Roane County 911 knows as Daniel Road. Daniel Road consists only of the Loop Access Road, which he highlighted in pink. There is no name designation for the Disputed Drive known as Kudzu Drive, which he highlighted in yellow. He testified that the Salas' tract 10 is on Kingston Highway; it has a reference point of 4071. He acknowledged that their designations are solely for emergency response purposes and not for purpose of title.

Plaintiff Michelle Lovett then testified that she and her husband, Eric Lovett, purchased tract 3, around 2002. At trial, she was shown a photograph that pictured a street sign denominating the disputed drive as "Kudzu Drive;" she agreed that the sign was present when she moved into the subdivision. Mrs. Lovett also testified that gate B was present at the Kudzu Drive sign in 2002, which is when she alleges she moved into her tract, and that the gate therefore pre-existed the Coles' residency.

Most notably, Mrs. Daniel testified. As noted at the beginning of this opinion, she was the previous owner of all of the tracts that now comprise the Daniels Estates Subdivision. She developed the subdivision. She testified that the Disputed Drive is called "Kudzu Road." She said it is a driveway to tract 9, which used to be her residential property. She indicated on a map of the subdivision that the disputed segment:

A:     …never was called Daniel Road.

Q:     What was it called?

A:     It wasn't called anything until I named it Kudzu.

Q:     Why did you name it Kudzu Road?

A:     'Cause of all the Kudzu. I made a wooded sign and put [it] up at the top of the hill because people couldn't find where I lived…

Q:     When did you do that?

A:     Back in ninety – about '92.

\*      \*      \*

Q:     …and then the County come by and put up a sign one day. When I come in from school, the sign was up there that said "Kudzu Lane."

She clarified that the Homeowners Easement Deed only granted the homeowners association the Loop Access Road. She testified that the Loop Access Road was fully accessible at the subdivision's conception.

There were originally eight tracts in the Daniel Estates Subdivision, *i.e.* tracts 1 through 8. Mrs. Daniel originally intended to keep what are now tract 9 and tract 10. She testified that tract 9 and tract 10 were "not part of the subdivision." At the subdivision's conception, Mrs. Daniel personally resided on tract 9, which is now owned by the defendant Coles. She testified that tract 10 was beside it "on the highway."

She testified that there were two gates pre-dating the Coles' purchase of tract 9. The gates were located on or about where the ones at issue are presently located – designated A and B on Figure 1. She recalled that the gates were installed around 1950 - 1955 for cattle retention purposes.

She testified that the Salas' tract 10 is "on Highway – that's on Kingston Highway." Mrs. Daniel was asked whether she ever referred to the Salas' tract 10 as "109 Daniel Road." She replied, "No…[w]hy would it have 109? There's not a house on it." She reiterated that she has never referred to it as being on Daniel Road, she testified that

"I know it's Kingston Highway," and she twice responded that "109 Daniel Road" does not exist.

Mrs. Daniel testified that she later deeded the disputed strip of land she refers to as "Kudzu" to the Coles, after the present litigation began. She never deeded the Disputed Drive to the homeowner's association, as plaintiffs contend; she testified that the Disputed Drive "goes with the house [tract 9]. Anybody should know that." She testified that:

> they should have known that Kudzu Drive went with the house [tract 9]. If you would take a look and drive out there, you'd see it has to be a driveway.

When asked if the easement makes a continuous loop from the western part of U.S. Highway 70 to the eastern part of U.S. Highway 70; she said that was not accurate, nor was it ever the intention. She did not recall what the various documents she signed said, but acknowledged that she signed them. She reiterated that the Coles have the deed to the tract that includes the disputed "Kudzu" drive.

Defendants then called two long-time Roane County resident witnesses to testify regarding the existence of an independent Kudzu Drive. The two witnesses do not live in the subdivision, but each has lived on property in close proximity to what is now Daniels Estates for several decades. They both recounted an independent Kudzu Drive and the gates having pre-existed defendants' residency.

The first long-time resident witness, Jerry Pickell, testified that he currently lives at "4016 Kingston Highway. That's just across Highway 70 from Kudzu Road." He lived there from January 1940 until September 1960; he returned in 1995 and has lived there since. He indicated on the plat that the Disputed Drive is what he refers to as "Kudzu Road." The end of his driveway is directly across from the Disputed Drive. He recalled growing up across from the Daniels' property. He testified that Mrs. Daniels used to supply his family with milk and that he used to mow their lawn as a youth. He testified that "Kudzu" has always been a driveway: "[w]hen someone asked, '[w]here does Mr. Daniels live?' we'd say, '[r]ight down there is his driveway [.]' "

Mr. Pickell witnessed the previous owner of tract 9, Mr. McCurry, install gate B at the end of the "driveway." He testified to the undeveloped nature of Kudzu Drive, stating that after passing through the driveway portion, there was a dirt road that was "real rough....you didn't want to drive a car down it." On cross, Mr. Pickell was asked whether the "rough" segment of the disputed road had ever been smoothed out prior to Mr. Cole moving in, and he replied no.

-11-

The second long-time resident witness, Mr. Schrimpsher, testified that he lives along U.S. Highway 70 bordering defendant Coles' property to the east. He has been on the property for 60 years. When asked the location of "Kudzu Drive," he testified that:

> ever since I've been old enough to know anything...it was at first Sam Daniels' driveway. Then he passed away, and Calvin got the place, and it become Calvin Daniels' driveway. He passed away, and then Peggy Daniels lived down there for awhile, and it was her driveway. And all I've ever knowed it is a driveway, is all I could say. It was a driveway.

He testified that the Disputed Drive was never called "Daniel Road." There used to be a "Kudzu Drive" sign. He recalled it was at first a wood sign, and then a metal sign. He testified that the gates allegedly installed by defendants pre-existed defendants; they were installed by previous owners for cattle and pig retention purposes.

Mr. Schrimpsher recalled that Mr. McCurry (the owner immediately prior to defendants) used the gates because he had an issue with trespassers going "through his property;" he testified that "there was too many people coming in and out of that road at night." He concluded by testifying that there is a guardrail on U.S. Highway 70, but he stated that individuals can access tract 10 (the Salas' property) from the portion abutting the highway, "I know there's places you could go in, in it, if you wanted to make a road."

As discussed elsewhere in this opinion, Mr. Leggins was the surveyor commissioned to survey Mrs. Daniel's real property for her to sell. He laid out the subdivision, in its entirety, including the location of the access road, on a plat. He is designated on the recorded plat as the "surveyor." The plat is stamped with his seal and dated April 4, 2002. At trial, he clarified the location of the intended access road.

Mr. Leggins testified that the original subdivision consisted of eight tracts. The "intended access to these tracts [tracts 1 through 8] was what you, or someone, has marked in the pink [Loop Access Road]." The Loop Access Road did not have a name at that point; it was just the subdivision's easement. Kudzu Drive was not a part of the easement; it is labeled independently on the plat's vicinity map. Mr. Leggins testified that Kudzu Drive "was not part of the subdivision, per se, and was not an access;" he testified that the Disputed Drive was "[Mrs.] Daniel's driveway:"

> Q:    All right. This, what's marked yellow [Disputed Drive] on here, is actually identified on this vicinity map, isn't it?
>
> A:    Yes.

-12-

Q:    And it's identified as what?

A:    Kudzu Drive.

Q:    Do you know when this road was named Daniel Road, this loop access road?

A:    All I know is it was -- it took on a name, for I guess the mail carrier, after the subdivision -- after I laid out these lots.

Q:    Well, can you show the [c]ourt what you were tasked with laying out as the access road to this subdivision.

A:    The intended access to these tracts was what you, or someone, has marked in the pink [Loop Access Road]. This part here (pointing) was not --

Q:    Let the record reflect he's covering up the [Disputed Drive] yellow tract -- yellow road with his hands.

A:    That was not part of the subdivision, per se, and was not an access. I don't -- I really don't know when that took on a name, and I don't even know for sure what that name is now.

Q:    Now, you stated earlier that this that's marked in pink was graded out at one point. The complete loop was graded out, opened up, this whole -- this complete loop, wasn't it?

A:    Well, pretty much. That was the part that was accessible to me. As I stated initially, it was just a grown-up wilderness. And so I picked out -- see, I had it all, the whole boundary, surveyed. That's the way I always made any subdivision. You've got to know what the whole is and where you can divide it. And so this lended [] itself as something that would be -- give road frontage and divided up in areas and also building sites.

-13-

Q:  Do you know how this property lays, what's marked as [t]ract 10, coming off of [U.S. Highway 70]? Is it accessible anywhere in here?

A:  Yes, it's accessible all -- all -- just about all of it.

Mr. Leggins then clarified why the subdivision's access road, as he describes it, and Kudzu Drive look the same width on the recorded plat:

Q:  All right. Can you tell the [c]ourt why this is marked out in a 50-foot designation, this Kudzu Road we're talking about that's marked in yellow?

A:  In laying out this subdivision, back then and now, the minimum right of way that the State requires is 50 feet. And so I gave this, in laying this out, all of it a 50-foot right of way or roadway. And if Ms. Daniel wanted at some later date to create or to sell off what is designated 9 and 10, the surveying would already be done. It's just easier not to have to come back and re-lick a cat, at the expense of the client. And this is, as it is, it's terribly curvy, and it's [] pretty much steep all of the way, hardly [] traversable with a two-wheel drive car. And I might add that this subdivision when laid out [] the road areas were graded. Ms. Daniel got some contractor to do it, and they graveled it. This was the last subdivision in our county to be approved with gravel roads.

Q:  What they graded and graveled was this area that's marked in pink [Loop Access Road], correct?

A:  That's correct.

Q:  They didn't grade and gravel this area marked in yellow [Disputed Drive], did they?

A:  They did not.

He acknowledged that the exhibit A plat has no indication of a "Daniel Road," but that it does indicate a "Kudzu Drive:"

-14-

Q: Once again, if this [recorded plat] is notice to the whole world, nowhere on this [e]xhibit A does it say Daniel Road, does it?

A: That's correct.

Q: But there is a notation identifying Kudzu Drive, pointing to that squiggly line, which has been colored in yellow on this big map, isn't there?

A: Yeah.

Q: So if someone were to go into the courthouse to rely on this map, they would see a notation showing Kudzu Drive, referencing this squiggly yellow road, correct?

A: Yes.

Q: And nothing identifying Daniel Road?

A: Correct.

Mr. Leggins testified that the Salas' tract 10 is accessible from the portion of the property abutting U.S. Highway 70.

Additionally, Karen Conner testified; she lives on real property abutting U.S. Highway 70, and bordering Daniels Estates tracts 2 and 3 to the north and tract 10 to the south. She testified that the Salas' have been trying to sell their real property for the past seven years or more. She attested to defendants' contentions that they have ongoing issues with people coming on their property without permission. She has called to inform Mr. Cole of trespassers on his property. She testified Mr. Cole is a good and helpful neighbor. \

Following the above testimony, the court concluded the portion of the trial regarding the subdivision's disputed easement. The Salas plaintiffs closed by stating that:

> the record is clear that my clients have been enjoined from all access on the portion of the road marked in yellow [Disputed Drive], and based on the testimony of Mr. Perry and Mr. Hutchison, we're asking for a permanent injunction in addition to this ownership question getting resolved so that this doesn't happen in the future. I think the testimony is clear that that's going to be necessary.

In closing, defendants argued that:

> by the testimony of all the people that testified, the only evidence before the Court at this point in time is that there's only one piece of roadway, the driveway, that's identified on this document anywhere. It's in the vicinity map, and it is Kudzu Drive, which is marked in yellow [Disputed Drive]. The rest of the testimony by all of the fact witnesses that have been in this area for 60-plus years is that this area marked in yellow is, was, and always has been the Daniel driveway, it was never meant to be access to Daniel Estates subdivision, and that the access road to Daniel Estates subdivision was marked in pink here as a loop. Peggy Daniel testified that [the Salas' property] was to have access from [U.S. Highway 70] and her tract accessed [U.S. Highway 70] through Kudzu Drive. That's the testimony that the Court has, considering that ambiguity that exists, and it's a very patent ambiguity in this matter.

> The Court is fully aware of the arguments in contract law that the intention of the parties at the time of executing the agreement – the agreement being the deed -- that is signed by the party to be charged, Melvia Mae Peggy Daniels, should control. In other words, the object to be obtained in construing the contract is to ascertain the meaning and intent of the parties as expressed and the language used is to give effect to such intent if it does not conflict with any rule, law, public policy. Well, that contract said she deeded them Daniel Road. It didn't say Daniel Road and Kudzu Drive. It said she deeded them Daniel Road...

> The witness that has testified as a fact witness, Mr. Bill Leggins, testified that this is demarked as a 50-foot easement because that was what the State required. And if he's going to put a road on there, there's no sense in coming back and, I think he said, licking that cat twice. So he put a 50-foot road easement in there, but there's nothing deeding that strip to the homeowners' association. The only thing referenced to the homeowners' association was deeding Daniel Road. So as the Court is well aware, contracts are to be enforced as written unless they're ambiguous. Then you have to use parol evidence. That's 47-50-112, and it's – there's no mistaking, in

-16-

getting to that attention, you have to go to what their intention was as embodied and expressed in the instrument as written. And the instrument as written only deeds Daniel Road. The weight of all the evidence, yes, there's documents that reference there was a – there was an easement, but the easement referenced in the plat goes to the plat named and dated and listed and filed. And you go to that plat, and if you've got any sense whatsoever, you look at it and you can see there's one road identified on there, Kudzu Drive. So the intent of the parties when she deeded that strip of land known as Daniel Road to the homeowners' association was that which has been marked in pink that makes a loop, and that's all the access that they -- that they were deeded, and it's all the access that is needed. They can go in, they loop around, they come back out, and they go out. She testified that these two tracts were hers, she still lived there, and that was her driveway. She never deeded it to the homeowners' association. She kept it. It was never meant to be deeded to the homeowners' association. It was her driveway. Mr. Schrimpsher says it was her driveway. Mr. Pickell, who's as much of a historian in this area as there is, says that's always been the Daniel driveway. It was never anything other than the Daniels' driveway. And then when Mr. McCurry had it, it was Mr. McCurry's driveway. They didn't testify that it became a road after Mr. McCurry got it. Mr. McCurry got it after it was divided…

And the testimony was that – that "Daniel Road" sign was put up by Cathy Rakestraw, that the "Kudzu Drive" sign existed before the property was subdivided. So, I mean, the intent of the parties when that road was deeded to the homeowners' association was for that to be Daniel Road as that loop, and Kudzu Drive was never part of that.

The trial court immediately held, from the bench, that that there was no ambiguity in the documents. It held that Mrs. Daniel's testimony is "an attempt to contradict the plain and unambiguous language of the documents, the plat which she had Mr. Leggins prepare and the restrictive covenants." The court noted that Mr. Leggins testified that the subdivision, as shown on exhibit A, initially included eight lots intended for sale, but that it was clear she might want to sell the last two lots. The court determined that her future intent to potentially sell the lots does not alter the plat as recorded. The court commented that the testimony indicates that the Loop Access Road was originally graded for access, but that it "has not been used or maintained and is now grown back up so that we have

-17-

only the pink area that extends furthest to the east, which connects with Tracts 4, 5, 6, 8, and 9."

The court further held that the information in the vicinity map "simply locates the subdivision for the purpose of reference." It held that one could "assume that all of the road, including the [Disputed Drive] and [Loop Access Road], were Kudzu Drive." Ultimately, it determined that the name designation does not matter, because the road, as the court understands it is "dedicated to the people who own lots in the subdivision." The court continues that:

> [a]nd where it says "All lots in the subdivision shall be served by a private, joint, permanent easement as the same is shown on the recorded plat of said subdivision" -- and it doesn't refer to the road there by name at all, so that we could give, in essence, any name to that, whether it's Kudzu Drive or Daniels Drive or whatever, and that wouldn't change the effect of the recorded documents, the documents that give legal effect to this subdivision. It wouldn't change anything by how we refer to that insofar as the foundational documents are concerned.

It then held that the conveyance from Mrs. Daniel to the Coles of Kudzu Drive, in 2016, was of no effect, because it was an attempt to change the outcome of a lawsuit after it had begun. It held that Mrs. Daniel had already conveyed this property to the homeowners association in the Homeowners Easement Deed. The court held the specific reference in the Homeowners Easement Deed conveying what is "more commonly known as Daniel Road" was:

> a superfluous, unnecessary descriptive term which does not in any way affect the division of the road as shown on the plat between the area that's marked in pink and the area that's marked in yellow.

In the court's subsequent judgment, it held that the whole of the 50-foot roadway shown on the plat constitutes the easement, and "said entire 50-foot roadway was conveyed to Daniel Estates Subdivision Homeowners' Association by Tennessee Quitclaim Deed from Melvia Mae Daniel." The court ordered defendants to immediately abate obstruction of the road:

> by removing the gates, the berm, and anything that might be preventing ingress and egress by and along Kudzu Drive or Daniel Road to Tract 10 or to any other lots of the Daniels Estates Subdivision.

Following the trial court's pronouncement of its holding from the bench, defendants attempted to present argument about a document referred to as the "Dedication of Easement," which was submitted to the court among the stipulated exhibits. The court refused to address any issues or hear any argument based on the document, because no testimony or other proof had been presented to the court about the document during the evidentiary proceeding. The court instead proceeded to the damages portion of the trial.

## C.

The Lovett plaintiffs' claim for "damages [are] the attorneys' fees Frantz, McConnell & Seymour have expended in representing the Lovett plaintiffs in this lawsuit." Defendants counter that damages are not warranted, because they had a good-faith belief, based on the representations of the original developer and all testifying non-party neighbors, that Kudzu Drive is a drive situated exclusively on their property and is their private driveway. All of defendants' actions were purportedly taken in defense of their property ownership.

Mr. Salas testified that he has "lost a sale" as a result of defendant Mr. Cole's actions. The Disputed Drive has allegedly become overgrown or otherwise damaged, and he believes he is therefore entitled to restoration and attorney's fees and expenses. However, he conceded that he does "not know the condition of the property."

April Freeman, a resident of 4101 Kingston Highway, testified on behalf of the defendants. She recalled the events recounted by Mr. Hutchison in the first part of the trial. She testified regarding the allegedly "threatening" encounter:

> I looked outside -- and I was home alone -- and there was two vehicles in the driveway between Mr. Cole's driveway and our driveway. And I didn't know who they were, and so I called Mr. Steve [Cole] up and I asked him if he knew these people. He said he'd be right up there in a moment to check it out. The reason I did so is because we had already had so many people coming in and out of our driveway, not knowing who they were, which made me nervous because I was by myself often in the daytime. So I felt safer if I had Mr. Steve come check it out.

\*     \*     \*

> Mr. Steve came up and respectfully asked the gentlemen what they were there for, and then they told him, and he politely asked them to move off that particular area just because it was in our driveway and [] that was bringing people in with solicitation that we didn't necessarily want there. And then they continued their conversation. At that point in time is when I went back inside. It seemed like they had it under control.

She did not observe any argumentative behavior.

Mr. Cole testified that the various impediments he allegedly erected pre-existed his family's residency. The berm pre-existed his purchase of the property; he has however maintained its height and integrity. He testified that:

> the gate here has always been there. It was there when we got there. It was locked when we got there. The berm was there. The gate to the north we installed, but that's nowhere near [t]ract 10.

Mr. and Mrs. Cole both testified that they have on-going issues with individuals coming onto their property without authorization.

Mr. Cole recounted a substantially different narrative regarding his encounter with Mr. Perry, the purported potential buyer of the Salas' property. He testified that, on the night at issue, he noticed individuals on his property at nighttime. He testified that it was "pitch black" when Mr. Perry was purportedly there to view the property. Mrs. Cole testified that there was no reason to believe that these people were there to view real estate that was for sale, because "they were on our property and we saw flashlights on our property." Because it was night time, Mr. Cole called 911 to report the unknown individuals on his property without permission:

> [t]here was no real estate for sale there. So my assumption was never real estate, or I – you know, my [] initial assumption is why are they in our property? Why was he up in our property with a flashlight, coming out of the woods, and why did they take off so quick? My first assumption to assume was 'They're hunting. They're up to something no good. Get some information.'

Sarah Cole, defendant's wife, testified that:

we got on the phone with 911, and we were tying (sic) to basically get a license plate because we had been concerned in the past with people going onto our property and possibly hunting, you know, people coming onto our property. So we were trying to make a report with 911, so we were on the phone with them, and we basically drove far enough to basically get their license plate and everything…

\* \* \*

We've also had people at our house when we're living there that actually came into our house and tried to steal stuff multiple times while we were remodeling our house. So we had concerns for that as well.

Mr. Cole also testified that he has never been on tract 10, and has not left any garbage or anything of that nature on their property, as alleged by the Salas plaintiffs. Additionally, regarding Mr. Hutchison's testimony, Mr. Cole denied ever having made any "threatening" comments, and even recalled having his baby in his arms when he spoke with Mr. Hutchison. He testified that he has never driven anyone off the property, but he has asked visitors to not block access to the Freemans' driveway.

Lastly, Mr. Cole testified that the Salases have been trying to sell their property for a while, and have even solicited him as a potential buyer:

[w]hen Ralph [Salas] and I had spoken, when I had learned of the property being for sale, initially he had tried to engage us about buying this property [tract 10]. That didn't work out, especially after we met people that said the address -- or the location of that road or that property is not and has never been on Daniel Road. I became very suspicious of what all of them were trying to do, and it was almost like they were trying to force us into buying the property. Can't use the word 'blackmail.' But they were really twisting our arm to buy the property under the guise of 'If you buy this property, you'll have more votes against the HOA and that way you won't have to pay for the road.'

After hearing the proof as to damages in this matter, the trial court stated from the bench that:

> I'm not inclined to disbelieve the Coles when they say that this is or was and could, if left to chance, become a problem area out there for people who are wanting to hunt on other people's property or to find a place to park and to drink and to do other things that might damage their property or other neighbors' property.
>
> It seems to me to be the kind of place that you could expect trouble to arise, and I don't -- I think the Coles were absolutely wrong in their methods by erecting the gates, by -- I believe he constructed the berms. But I didn't hear anything to indicate that he was doing that for the purpose of trying to -- that he was doing it for a malicious reason or doing it recklessly. He may have had a long-term view, and that might be why he got the deed from Ms. Daniel of acquiring the road.

The court took the matter under advisement, noting:

> [g]entlemen, I'm going to take this under advisement for a few days, and I'm going to think about it. There's no reason -- first of all, I'll tell you that I don't think there's any reason why I have to, even if I award damages against Mr. Cole, why I have to award all of the attorney fees and litigation expenses. There's no reason I have to do that. I don't think the law requires such a result.

Contrary to its prior pronouncement, in the court's subsequent memorandum opinion, the court held defendants' testimony that their alleged actions were taken in defense of what they sincerely considered to be their property was not credible. The court disregarded defendants' arguments that the obstructions on Kudzu Drive pre-existed their residency, instead held that defendants had "erected two locked gates," and held that any previous grants and uses were irrelevant in the present matter. The court also held that the Salases "clearly hold the right to use Kudzu Drive for ingress and egress in common with all other lot owners."

The court awarded "damages to all of the [p]laintiffs for [s]lander of [t]itle." The court awarded $14,133.79 in attorney's fees and expenses to each set of plaintiffs in the two consolidated matters. The court awarded an additional $750 to plaintiffs, in *Eric Lovett et al. v. Marshall Steven Cole, Jr. et al.*, for attorney's fees and expenses incurred in preparing the final order for the court. Defendants appeal.

-22-

## II.

Defendants raise the following issues:

> Whether the trial court erred in holding the quitclaim deed executed by Ms. Daniel that granted "Daniel Road" to the subdivision's homeowners association included "Kudzu Drive."

> Whether the trial court erred in holding defendants slandered plaintiffs' titles.

> Whether the trial court erred in awarding plaintiffs' attorneys fees and expenses.

Plaintiffs raise the following issues:

> Whether volumes VI, VII, and VIII of the record herein must be disregarded, along with the assertions in defendants' brief based thereon.

> Whether the portions of defendants' brief raising assertions that are not supported by citation to the record must be disregarded.

> Whether the portions of defendants' brief raising assertions referencing large segments of the record must be disregarded.

> Whether those claims raised in defendants' brief and not asserted at trial must be deemed waived on appeal.

> Whether the trial court properly refused to hear argument on a matter not presented at trial.

> Whether the trial court properly determined that the entire right of way shown upon the recorded plat of Daniels Estates Subdivision is owned by the subdivision's homeowners association.

> Whether the trial court properly ordered defendants' removal of the gate blocking the alleged joint and permanent easement.

Whether the trial court properly awarded plaintiffs' attorneys fees as damages as a result of defendants' slander to title.

Whether plaintiffs are entitled to an award of attorney fees incurred as a result of this appeal for continued slander to title or for frivolous appeal.

Pursuant to orders entered by this Court, the record on appeal was supplemented with documents filed in the trial court by defendants. Importantly, these documents were not filed with the trial court before trial or entered as exhibits at trial. We limit our review to those issues raised, presented, and argued before the trial court. Specifically, arguments surrounding a 2004 document referred to as the "Dedication of Easement" have been waived, as no testimony or other proof was presented at trial regarding its effect upon the issues before the court. With these limitations in mind, we proceed to our review.

## III.

In this bench trial, our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. ***S. Constructors, Inc. v. Loudon County Bd. of Educ.***, 58 S.W.3d 706, 710 (Tenn. 2001).

## IV.

## A.

It is important to note at the outset of our analysis that the Daniels Estates Subdivision was created in 2002. Correspondingly, the relevant documents that established the original dedication of the joint permanent private easement were executed in 2002; these include the 2002 recordation of the plat and the 2002 execution of the Restrictions. With this in mind, we begin our review by looking only to the two foundational documents in order to ascertain whether the trial court erred in holding that there is no ambiguity in those documents as to the location of the easement established therein.

"The construction of restrictive covenants, like other written contracts, is a question of law." ***Hughes v. New Life Dev. Corp.***, 387 S.W.3d 453, 480–81 (Tenn. 2012). "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." ***Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.***, 78 S.W.3d 885, 890 (Tenn. 2002). "In the

construction of instruments creating easements, it is the duty of the court to ascertain and give effect to the intention of the parties." 28A C.J.S. *Easements* § 57 (1996); ***Burchfiel v. Gatlinburg Airport Auth.***, No. E2005-02023-COA-R3-CV, 2006 WL 3421282, at *3 (Tenn. Ct. App. Nov. 28, 2006).

If the language in the contract is clear and unambiguous, then the "literal meaning controls the outcome of the dispute." ***Allstate Ins. Co.***, 195 S.W.3d at 611; ***City of Cookeville, Tn. v. Cookeville Regional Med. Ctr.***, 126 S.W.3d 897, 903 (Tenn. 2004); ***Planters Gin Co.***, 78 S.W.3d at 890. If, however, the language in a contract is susceptible to more than one reasonable interpretation, then the parties' intent cannot be determined by a literal interpretation of the contract. ***Allstate Ins. Co.***, 195 S.W.3d at 611 (*citing* ***Planters Gin Co.***, 78 S.W.3d at 889–90). Contract language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." ***Allstate Ins. Co.***, 195 S.W.3d at 611 (*quoting* ***Farmers–Peoples Bank v. Clemmer***, 519 S.W.2d 801, 805 (Tenn. 1975)).

The trial court concluded, as a matter of law, that the Restrictions and plat, when read in conjunction, are unambiguous as to the location of the intended easement. When rendering "its opinion from the bench," the court held:

> the real issue here as raised by [defense counsel] is this issue about whether or not there's some ambiguity here. And I have looked at all of this, and I don't find any ambiguity at all. I don't see any ambiguity in these documents, and for Ms. Daniel to testify what -- and what secret intent she may have had is, of course, an attempt to contradict the plain and unambiguous language of the documents, the plat which she had Mr. Leggins prepare and the restrictive covenants, which were also prepared and recorded along with the plat. And the plat and the restrictive covenants should be considered together. They're not separate documents. They are actually part of one document, and so we need to look at them and construe them together.

Significantly, there is nothing in the Restrictions' description of the easement that specifies its intended parameters; it merely says "a private joint permanent easement as the same is shown on the recorded plat of said subdivision." A review of the four corners of the referenced plat does little, if anything, to provide clarity as to the location of the easement. The recorded plat identifies several items by specific reference: "U.S.T.V.A. power transmission lines," a "tower," the various subdivision tracts and their acreage, the names of property owners in parcels abutting the subdivision and their respective property attributes and recorded plat location, various "iron rods" marking tract boundaries, "U.S. Highway 70," "Kudzu Drive," and the fact that "Dogwood Road" is

located approximately a half a mile from what is identified as Kudzu Drive in the vicinity map, just to name a few. However, there is no easement identified anywhere within the subdivision shown on the plat. The easement's location is also not otherwise identified anywhere on the perimeter of the plat.

There is a segment on the plat that appears to be a surveyed road within the subdivision. The only segment of the surveyed road that is denominated on the plat is a portion identified as "Kudzu Drive," which is identified in the plat's vicinity map. There is no break in the surveyed road, and therefore there is no clear indication of Kudzu Drive's precise parameters. While one might be tempted to conclude that the whole of the surveyed road is the easement, we are left to wonder why no reference was made to Kudzu Drive in the Restrictions' crude description of the easement. Given that the Restrictions creating the easement specifically reference the plat, we know that the name of Kudzu Drive was available to the drafters of the Restrictions for specific reference if Kudzu Drive was intended to denominate or otherwise define the easement at issue, or even a part of the easement at issue. It was not. It is possible to reasonably conclude that Kudzu Drive is labeled on the plat to indicate that it is a separate road within the subdivision independent of the easement; it is also possible to reasonably conclude that Kudzu Drive is labeled and the subdivision's easement road is not, because the easement did not have a name when the plat was created, but Kudzu Drive did. With the information available at this juncture, we are unable to draw any such conclusions, as a matter of law, absent clear support in the documents, of which there is none. Additional information is necessary, because the provision at issue is uncertain in meaning and may fairly be understood in more ways than one.

Therefore, even when read in conjunction, the Restrictions and the plat do not sufficiently identify the location and parameters of the easement "as the same is shown on the recorded plat." More than one reasonable conclusion could be reached. The language used in the foundational documents alone is therefore insufficient to resolve the present dispute. Accordingly, we hold that the trial court's conclusion, as a matter of law, that the documents are unambiguous, was clear error. For the reasons outlined herein, we hold that the language used in the Restrictions is ambiguous as to the location of the easement. The ambiguity inherent in the relevant easement-establishing documents necessitates further review of the evidence elicited in this matter regarding the circumstances surrounding the creation of the easement in the 2002 documents.

**B.**

**1.**

When a written document creating an easement is held to be ambiguous, a court may look to the circumstances under which the easement was created to making a finding of fact as to the meaning of the declaration. *See Adkins v. Bluegrass Estates, Inc.*, 360

S.W.3d 404, 411 (Tenn. Ct. App. 2011) (citations omitted). Parol evidence may be used to determine the meaning of the documents; a factfinder may use extrinsic or parol evidence, such as the parties' course of conduct and statements, to guide the court in construing the contract. *Allstate Ins. Co.,* 195 S.W.3d at 612. The intent of the contracting parties at the time of executing the agreement governs. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.,* 78 S.W.3d at 890. We therefore look to the evidence elicited at trial regarding the circumstances under which the Restrictions and referenced plat were created in order to ascertain the intended location of the subdivision's easement.

Again, the events relevant to our present inquiry occurred in 2002. On April 4, 2002, the "recorded plat of said subdivision," referenced in the Restrictions, was created by the surveyor, Mr. Leggins. On April 10, 2002, the Restrictions were executed by Ms. Daniel. The Restrictions are referenced on the recorded plat in the vicinity map, as seen in Figure 2. On May 8, 2002, the plat was certified and adopted by Ms. Daniel. Therefore, we look to the testimony elicited at trial regarding the 2002 creation of the subdivision's easement for clarity on what is the "private joint permanent easement as the same is shown on the recorded plat of said subdivision."

As outlined *infra*, Mr. Leggins personally surveyed Mrs. Daniel's real property and created the subdivision's plat. His testimony is therefore especially compelling regarding the intended location of the subdivision's easement. He testified that the subdivision originally consisted of eight tracts intended for sale. The intended access road to the tracts, *i.e.* the joint permanent private easement, was the Loop Access Road, which later came to be known as "Daniel Road." The Loop Access Road did not have a name when the subdivision was platted; it was simply referred to as the subdivision's easement. He clarified that Kudzu Drive did have a name at the subdivision's conception, hence its independent denomination on the plat's vicinity map. He further clarified that Kudzu Drive was independently named, because it was not a part of the subdivision's access road; it was solely Mrs. Daniel's driveway.

Mr. Leggins also explained that only the intended access road was graded and graveled. Kudzu Drive was not, which is further supported by the testimony of several witnesses indicating that Kudzu Drive is rough terrain. Only the Loop Access Road was graded and graveled, because it was the only access road. Mr. Leggins further clarified why the denominated Kudzu Drive looks the same width on the plat as the Loop Access Road. He testified that, when he was drafting the plat, he surmised that Mrs. Daniel might want to sell her residential tract at a later date; he platted "Kudzu Drive" as 50-feet wide, the same width as the actual graded and graveled subdivision access road, so that it would be consistent with applicable law and she would not have to have another plat drawn. Significantly, Mr. Leggins' testimony and recounting of the events surrounding the inception of the subdivision is consistent with Mrs. Daniels' testimony.

Based on the foregoing, we hold that, when Ms. Daniel created the 2002 Restrictions and recorded the 2002 survey plat, the joint permanent private easement consisted only of the Loop Access Road. The disputed Kudzu Drive was not included, and was not intended to be included, in the subdivision's easement.

However, our analysis does not end here, because Mrs. Daniel eventually sold tracts 9 and 10. We continue with a review of the language used in the 2005 Homeowners Easement Deed that granted the subdivision's homeowners association the easement. We consider whether or not Mrs. Daniel intended to expound upon the original easement, and to further grant, upon her execution of the Homeowners Easement Deed, the independent Kudzu Drive to the homeowner's association for purpose of accessing the two additional subdivision tracts.

**2.**

Quoted *infra*, and reproduced below for the reader's convenience is the relevant portion of the 2005 Homeowners Easement Deed, executed by Mrs. Daniel, describing the easement transferred to the homeowner's association:

> …being known and designated as the joint private permanent easement within Daniels Estates Subdivision, more commonly known as Daniel Road, as shown by map of same of record in Plat Cabinet B, Page 142 in the Register's Office for Roane County, Tennessee, to which map specific reference is hereby made for a more particular description.

Again, "Plat Cabinet B, Page 142 in the Register's Office for Roane County, Tennessee" does not indicate what is "more commonly known as Daniel Road;" it only indicates Kudzu Drive. The trial court dispelled with the ambiguity in the Homeowners Easement Deed's reference to Daniel Road, by holding that the reference:

> there as to the road as shown on the plat, as being more commonly known as Daniel Road, as a superfluous, unnecessary descriptive term which does not in any way affect the division of the road as shown on the plat between the area that's marked in pink and the area that's marked in yellow.

The trial court improperly determined that the language used in the Homeowners Easement Deed granting a specified road – Daniel Road – to the homeowner's association is "superfluous." In construing contracts, we are to give effect to all the language included therein, as the law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous. *Crossville Med.*

*Oncology, P.C. v. Glenwood Sys., LLC*, 610 F. App'x 464, 468 (6th Cir. 2015) (internal quotations and citations omitted). The specific reference to a road name is clearly intended to elucidate the precise road included in the grant; likewise, it also elucidates what is to be excluded. This reasoning is in accordance with the common-sense notion that roads are denominated in order to differentiate one from the other.

When determining the easement parameters granted to the homeowner's association, in the Homeowners Easement Deed, the trial court also erred by concluding that the name designation given to the roads in the subdivision "doesn't matter:"

> ...But the fact of the matter is that it doesn't matter what name appears on these roads because the road as shown on the map, regardless of its name, is the road that's dedicated to the people who own lots in the subdivision. And where it says 'All lots in the subdivision shall be served by a private, joint, permanent easement as the same is shown on the recorded plat of said subdivision' -- and it doesn't refer to the road there by name at all, so that we could give, in essence, any name to that, whether it's Kudzu Drive or Daniels Drive or whatever, and that wouldn't change the effect of the recorded documents, the documents that give legal effect to this subdivision. It wouldn't change anything by how we refer to that insofar as the foundational documents are concerned.

By so holding, the trial court sidestepped an issue essential to resolving the present dispute and improperly rendered significant language in the relevant documents null.

It is abundantly evident from our above discussion, a review of the relevant documents, and the testimony provided at trial, that the name designation given to the roads in the subdivision *does* matter. The Homeowners Easement Deed refers to the easement granted therein by a specific subdivision road name – Daniel Road. As noted in the previous section of this opinion, when we look at the plat, it does not denominate Daniel Road in the subdivision, but it does denominate a Kudzu Drive. It follows that, whatever is Daniel Road on the referenced plat, must necessarily exclude what is identified as Kudzu Drive on the plat.

The ambiguity surrounding the parameters of "Daniel Road" is clarified by testimony elicited at trial. The most compelling testimony came from Mrs. Daniel, the developer and previous owner of all the tracts, who personally named Kudzu Drive. She testified that Kudzu Drive and Daniel Road are separate roads. She testified that Kudzu Drive is a part of tract 9, and "never was called Daniel Road." Again, she clarified that what is now known as Kudzu Drive is tract 9's driveway, which she personally named.

-29-

In addition, Mr. Leggins clarified that the Loop Access Road acquired its road name after the plat was created, which is why it is not labeled on the recorded plat. Kudzu Drive is independent and pre-dates the subdivision, which is why it is labeled on the recorded plat. He testified that the road known as Kudzu Drive "was not part of the subdivision, per se, and was not an access."

In addition, all non-plaintiff neighbors testified that Kudzu Drive and Daniel Road do not reference a single subdivision road. All non-plaintiff neighbors testified that the Disputed Drive is an independent road called Kudzu Drive, as seen on the plat. Lastly, the vicinity map on the recorded plat specifically denominates the independent Kudzu Drive precisely where all of the above-noted witnesses testified it is independently located.

Based on the foregoing, we hold that the evidence overwhelmingly preponderates in favor of Kudzu Drive being a drive independent of Daniel Road. *A fortiori*, a grant to the homeowner's association of Daniel Road necessarily excludes Kudzu Drive.

## V.

In sum, and to ensure clarity in the resolution of this matter, we hold that the joint permanent private easement in Daniels Estates Subdivision consists of the Loop Access Road shown on the recorded plat; it is named Daniel Road. Daniel Road begins in the western portion of the subdivision on U.S. Highway 70 and proceeds through the subdivision into a closed loop, rejoining the original road, and ultimately returning to the same location as Daniel Road's origin. The homeowner's association, by virtue of the grant contained in the Homeowners Easement Deed, holds title only to Daniel Road as the easement for the use of the applicable subdivision tracts. Specifically, the subdivision's easement does not include the Disputed Drive, named Kudzu Drive, which is indicated on Figure 1 with interlocking "X" marks and denominated on the subdivision's recorded plat.

We hold that the disputed interlocking "X" marked drive, as seen on Figure 1 in this opinion, is named Kudzu Drive. Kudzu Drive runs north from U.S. Highway 70 to its intersection with Daniel Road, as defined in this opinion. Kudzu Drive is not a public road. Kudzu Drive is not a part of, or subject to, the Daniels Estates Subdivision's easement. Kudzu Drive is situated exclusively on tract 9 of the Daniels Estates Subdivision; it is included in the real property that comprises tract 9. Defendants presently have title to Kudzu Drive by virtue of their ownership of the deed to tract 9. Defendants' ownership of Kudzu Drive does not preclude their right to access and use Daniel Road.

It is important to remember that real property owners have all the rights incident or necessary for proper enjoyment of their land; as the Supreme Court has stated, a "property owner's right to own, use, and enjoy private property is a fundamental right:"

> [a]s such, this Court has held that: every proprietor of land, where not restrained by covenant or custom, has the entire dominion of the soil and the space above and below to any extent he may choose to occupy it, and in this occupation he may use his land according to his own judgment, without being answerable for the consequences to an adjoining owner, unless by such occupation he either intentionally or for want of reasonable care and diligence inflicts upon him an injury.

*Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 474 (Tenn. 2012) (internal citations omitted).

To prevent further disputes, we further clarify that, based on our holding, the real property comprising tract 10 in Daniels Estates Subdivision does not abut Daniel Road.

We affirm the trial court's striking of the 2016 quitclaim deed executed by Mrs. Daniel to the Coles. We hold that the deed is properly stricken, because it is redundant based on our holding, *i.e.* the property deeded to the Coles was already the Coles' property based upon their 2013 purchase of the entirety of tract 9. In addition, our holding renders redundant any post-2002 document and/or deed purporting to grant Kudzu Drive or any easement found thereon to the owner of tract 9.

Accordingly, based on our holding, we also reverse the trial court's monetary awards to all of the plaintiffs.

## VI.

The judgment of the trial court, including its awards of damages, are reversed. Costs on appeal and at the trial court level are assessed against the appellees Cathy Rakestraw, Clair James Rakestraw, Jr., Eric S. Lovett, Michelle A. Lovett, James P. Goodman, Ruth A. Goodman, Matthew F. Berry, Deanna Berry, Ralph Salas, and Gisela Salas. This case is remanded to the trial court for enforcement of our judgment.

_____
CHARLES D. SUSANO, JR., JUDGE